Deposition of Andy Lozano                                          Steven Gomez vs. Andy Lozano

```
1   DATE:              September 3, 2010

2   TO:                ANDY LOZANO
                       c/o ROSEN, SWITKES & ENTIN P.L.
3                      ATTN:  ROBERT L. SWITKES, ESQ.
                       407 Lincoln Road, Penthouse SE
4                      Miami Beach, Florida 33139

5   IN RE:   Steven Gomez v. Andy Lozano et al

6   CASE NO.: 09-22988-CIV-JORDAN/MCALILEY

7        Please take notice that on the 25th day of
    August, 2010, you gave your deposition in the
8   above-referred to matter.  At that time, you did not
    waive signature.  It is now necessary that you sign
9   your deposition.

10       Please call our office at the below-listed number
    to schedule an appointment between the hours of 9:00
11  a.m. to 4:30 p.m., Monday through Friday.

12       If you do not read and sign the deposition within
    a reasonable time, the original, which has already
13  been forwarded to the ordering attorney, may be filed
    with the Clerk of the Court.  If you wish to waive
14  your signature, sign your name in the blank at the
    bottom of this letter and return it to us.

15                            Very truly yours,
16                            NETWORK REPORTING

17

18                            _____
                              MICHELE ANZIVINO, Court Reporter
19                            305-358-8188

20  I do hereby waive my signature:

21

22  _____
    ANDY LOZANO

23

24  Cc via transcript:   John B. Ostrow, Esq.

25
```

Network Reporting Corporation          (305)358-8188 * (888)358-8188                    Page: 73

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2         CASE NO. 09-22988-CIV-JORDAN/MCALILEY

 3     - - - - - - - - - - - - - - - -

 4     STEVEN GOMEZ,

 5              Plaintiff,

 6     vs.

 7     ANDY LOZANO, RAYMOND CHAMBERS,
       and JULIO BLANCO,
 8
                Defendants.
 9
       - - - - - - - - - - - - - - - -
10

11

12

13                  DEPOSITION OF
                    ANDY LOZANO
14
           Taken on Behalf of the Plaintiff
15
           DATE TAKEN:   August 25, 2010
16         TIME:         10:31 AM - 12:19 PM
           PLACE:        44 W. Flagler Street, Suite 1250
17                       Miami, Florida

18

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2   On Behalf of the Plaintiff:
     JOHN B. OSTROW, PA
 3   BY: JOHN B. OSTROW, ESQ.
          STEPHEN A. OSTROW, ESQ.
 4   44 West Flagler Street, Suite 1250
     Miami, Florida 33130
 5   305.371.7999

 6   On Behalf of the Defendant:
     ROSEN, SWITKES & ENTIN P.L.
 7   BY:  ROBERT L. SWITKES, ESQ.
     407 Lincoln Road, Penthouse SE
 8   Miami Beach, Florida 33139
     305.534.4757
 9
     Also present:  Raymond Chambers
10

11
                    I N D E X
12
     WITNESS:            DIRECT   CROSS   REDIRECT   RECROSS
13
     ANDY LOZANO
14
     By Mr. Ostrow          3        --        --         --
15
                          - - -
16
                    E X H I B I T S
17
     NUMBER          DESCRIPTION                      PAGE
18
       1        Copy of prior statement given          6
19
       2        Hand-drawn diagram
20

21

22              CERTIFIED QUESTIONS
                          - - -
23              PAGE           LINE

23              52             16
24

25
```

```
 1                   P r o c e e d i n g s
 2          Deposition taken before Michele Anzivino, Court
 3     Reporter and Notary Public in and for the State of
 4     Florida at Large, in the above cause.
 5                           - - -
 6     Thereupon,
 7                      ANDY LOZANO,
 8     having been duly sworn or affirmed, was examined and
 9     testified as follows:
10               THE WITNESS:  Yes.
11                    DIRECT EXAMINATION
12     BY MR. OSTROW:
13          Q.    Tell us your name, please.
14          A.    Andy Lozano.
15          Q.    And your professional occupation,
16     Mr. Lozano?
17          A.    Police officer.
18          Q.    What's your date of birth?
19          A.    May 2, '86.
20          Q.    By whom are you employed?
21          A.    Miami Beach Police Department.
22          Q.    Am I correct in my assumption that you have
23     been deposed in the past?
24          A.    Yes.
25          Q.    So I don't have to go through an explanation
```

1    of what a deposition is to you?

2         A.    No, sir.

3         Q.    Prior to the deposition you've had an

4    opportunity to consult with counsel, and he also

5    explained to you what a deposition was and how you

6    should conduct yourself?

7         A.    Yes.

8         Q.    Okay.  So in the interest of expedience I

9    I'll save you that pain of going through it again.

10             At any time prior or before this deposition,

11   have you reviewed the deposition you gave in the

12   criminal case?

13        A.    Yes.

14        Q.    Okay.  When was the last time you looked at

15   it?

16        A.    The last time I looked at it?  About 30

17   minutes before you entered the room.

18        Q.    Okay.  In reviewing that transcript, was

19   there any of the testimony that you gave in that

20   deposition that on reflection you wish to correct or

21   change?

22        A.    Nothing specifically as to changing my

23   answers, but to elaborate more on certain things, yes.

24        Q.    What things are those?

25        A.    I would have to go through it to -- to

```
 1    remember exactly what it was.

 2         Q.    Okay.  Well, was there any answer that you

 3    gave that was factually incorrect in that deposition?

 4         A.    Yes.

 5         Q.    What was that?

 6         A.    Things that I said other officers saw when

 7    there's no way I can be able to say another officer

 8    saw something.  I just assumed.

 9         Q.    Okay.

10         A.    A lot of assumptions.

11         Q.    Okay.  How about the testimony of what you

12    saw on reflection, do you have any changes you wish to

13    make in any of that testimony?

14         A.    No.

15         Q.    Have you given a statement concerning this

16    incident to internal affairs?

17         A.    No.

18         Q.    Have you been asked by internal affairs to

19    give a statement?

20         A.    Not yet.  I've been given a notice that I

21    will have an interview, but they have not given me a

22    date yet.

23         Q.    Have you read any of the statements of the

24    independent witnesses to this incident?

25         A.    No.
```

Deposition of Andy Lozano

Steven Gomez vs. Andy Lozano

```
 1        Q.     Other than police officers, do you know of
 2   any witnesses to this incident?
 3        A.     No.
 4        Q.     Have you spoken about this incident with any
 5   of the lifeguards on Miami Beach?
 6        A.     No.
 7        Q.     Have you since the time of your prior
 8   statement recalled any of the facts surrounding the
 9   incident which you did not recall or remember at the
10   time that you gave your prior statement?
11        A.     No.
12        Q.     I'll try not to go over the entire prior
13   statement, but what I will do however is attach that
14   statement and make it a part of -- make it an exhibit
15   to this deposition as Exhibit 1.
16               (The document referred to was thereupon
17        marked as Deposition Exhibit 1 for identification)
18   BY MR. OSTROW:
19        Q.     The first thing I'd like to do if I may is
20   get clear in my mind where this incident or incidents
21   occurred on the beach.  And here is a piece of yellow
22   paper.  I'm drawing a wavy line on one end to
23   represent the water's edge, okay, and a legend
24   representing north and south.  Do you see that?
25        A.     Yes.
```

1      Q.      Okay.   The water obviously is to the east,

2  and Ocean Drive is down on this end.

3      A.      Yes.

4      Q.      And I'm going to put a box with an X in it

5  to represent the lifeguard tower.

6      A.      Yes.

7      Q.      There was a lifeguard tower in the vicinity,

8  correct?

9      A.      Yes.

10     Q.      And I'd like to use that as a point of

11  reference.

12             Now, it's my understanding that your first

13  indication that there was a problem of some sort on

14  the beach was that you received a call over your

15  radio; is that accurate?

16     A.      Yes.

17     Q.      All right.   And that was a call where you

18  heard another officer asking for assistance?

19     A.      Yes.

20     Q.      Who was that officer?

21     A.      Sergeant Ruder.

22     Q.      Okay.   And at that time you were five blocks

23  -- approximately five blocks north of the area of the

24  incident?

25     A.      Approximately, yes.

1     Q.     Okay.  And you were on an ATV?

2     A.     Yes.

3     Q.     Okay.  In response to having heard that

4  call, you directed your ATV in the area of -- towards

5  the area of the disturbance?

6     A.     Yes.

7     Q.     Now as you approached the area of the

8  disturbance, what was your first observation?

9     A.     I see a large crowd.

10    Q.     Okay.  Where?

11    A.     Near the lifeguard stand.

12    Q.     Was it north of the lifeguard station or

13  south of the lifeguard station?

14    A.     South.

15    Q.     Okay.  Approximately how far south of the

16  lifeguard station?

17    A.     Approximately 20, 30 feet.

18    Q.     Okay.  And was it east or west of the

19  lifeguard station?

20    A.     I'm not sure.

21    Q.     Was it closer to the water or closer to

22  Ocean Drive?

23    A.     I don't recall.

24    Q.     Okay.  Do you recall whether it was on the

25  hard pack area of the sand or on the soft sand?

```
 1        A.    On the soft sand.

 2        Q.    All right.  Would you draw a circle large

 3   enough to encompass the area?  You said 30 yards

 4   south --

 5        A.    30 feet.

 6        Q.    -- 30 feet south of the tower where the

 7   incident was?

 8             MR. SWITKES:  Object to the form.  And I

 9        don't think we'll have any question that this

10        diagram, although I'm not going to in any way

11        criticize your artistic ability, is not to scale

12        and certainly is not verifiable of anything

13        definitively.  Do what he asked.

14   BY MR. OSTROW:

15        Q.    Go ahead.

16        A.    It would be approximately -- I don't know if

17   it's east or west of the lifeguard stand, but

18   approximately in this general area (indicating).

19        Q.    Okay.  And you have drawn a circle, and that

20   circle would more likely or not encompass -- somewhere

21   within that circle is where it happened?

22        A.    Yes.

23        Q.    So you saw a crowd of people.  And did you

24   identify -- were you able to identify any particular

25   person within that circle?
```

1    A.    At the time I didn't know it was defendant

2  Gomez, but I did see a person in red shorts which

3  later I found out it was defendant Gomez throwing

4  punches.

5    Q.    Okay.  And was he in the center of the

6  group, towards the north of the group, towards the

7  south of the group?

8    A.    I don't recall.

9    Q.    Okay.  And was his back to you or his front?

10   A.    I don't recall.

11   Q.    Well if you don't recall, then was there

12 only one person in red shorts on the beach that day?

13        MR. SWITKES:  Objection to form.

14        THE WITNESS:  I'm not sure if there was more

15    than one person with red shorts, but to the best

16    of my knowledge that's the one that was throwing

17    the punches that I saw.

18 BY MR. OSTROW:

19   Q.    Okay.  Was there any of the crowd between

20 you and the person throwing the punches?

21   A.    Yes.  I don't know how many people or

22 anything, but yes.

23   Q.    More than five?

24   A.    Possibly.

25   Q.    More than ten?

1    A.    Possibly.

2    Q.    Okay.  So it was possible there were ten

3  people between you and the person that you identified

4  as wearing red shorts and throwing punches.  Did you

5  see the other officer within that crowd?

6        MR. SWITKES:  Objection to form.

7        THE WITNESS:  I saw several officers.  I

8    don't know exactly where they were.

9  BY MR. OSTROW:

10    Q.    Were they within that circle?

11    A.    Possibly.  I'm not sure.

12    Q.    Okay.  So you saw who you later identified

13  as Mr. Gomez throwing punches, and you saw several

14  officers in the vicinity of that?

15    A.    Correct.

16    Q.    Okay.  Are you able to identify any of those

17  officers?

18    A.    No.

19    Q.    And why not?

20        MR. SWITKES:  Objection, form.

21  BY MR. OSTROW:

22    Q.    Was it because you were so far away that you

23  couldn't identify them?

24    A.    No, it's because there was a lot of stuff

25  going on.  It was chaotic.  I didn't focus my

```
 1   attention on only the officers that were there.  I was

 2   basically on the way over there seeing if there was

 3   anybody with any weapons, bottles in their hands just

 4   for the officer's safety.

 5        Q.    Okay.

 6        A.    I didn't focus on what officers were there.

 7        Q.    But you did -- you focused on Mr. Gomez?

 8        A.    Yes.

 9        Q.    Okay.  And when you brought your vehicle to

10   a stop -- let me back up.

11              How long did it take you from the time that

12   you first received the call until you were on the

13   scene?

14        A.    I don't know exactly how long it took me,

15   but I know I got there pretty quick.

16        Q.    You traveled five blocks.  Did you travel

17   along the hard pack sand to get there?

18        A.    Yes.

19        Q.    Okay.  And as you traveled along that hard

20   pack sand, am I correct that you were careful of the

21   safety of other beachgoers?

22        A.    Yes.

23        Q.    How fast were you traveling?

24        A.    I don't know.

25        Q.    Give me an approximation.
```

Deposition of Andy Lozano                                    Steven Gomez vs. Andy Lozano

```
 1        A.    I don't know.  I don't have an
 2   approximation.  I don't know how fast I was going.
 3        Q.    Were you going more than 30 miles an hour?
 4        A.    It's possible.
 5        Q.    It's possible that you traveled along a
 6   crowded beach in an ATV at more than 30 miles an hour?
 7        A.    It's possible.
 8        Q.    More than 40 miles an hour?
 9        A.    I don't know.
10        Q.    More than 50?
11        A.    I don't know.  Probably not.
12        Q.    Where did you stop your vehicle?
13        A.    Somewhere near the crowd.
14        Q.    Was it north or south of the lifeguard
15   station?
16        A.    I don't know exactly where it was.
17        Q.    All right.  Was it closer to the lifeguard
18   station than the crowd or was it within that circle
19   that you drew?
20        A.    I'm not sure.
21        Q.    Now, do you have difficulties with your
22   memory?
23              MR. SWITKES:  Objection to form.
24              THE WITNESS:  No.
25
```

Deposition of Andy Lozano                                    Steven Gomez vs. Andy Lozano

```
 1    BY MR. OSTROW:
 2        Q.    Okay.  Are you taking any medication at this
 3    time?
 4        A.    No.
 5        Q.    Okay.  So after you stopped your vehicle,
 6    did you make contact with any of the police officers?
 7        A.    No.
 8        Q.    What did you do?
 9        A.    Not that I recall.
10        Q.    What was the first thing that you did?
11        A.    Tried to separate the crowd.  Back everybody
12    up.
13        Q.    All right.  And -- within that circle?
14        A.    Within the general area, yes.
15        Q.    Well, the general area included within the
16    circle that you drew?
17        A.    Yes.
18        Q.    Okay.  So as you tried to back people up, in
19    which direction were you facing?
20        A.    I don't remember.  I know I was walking
21    around just kind of telling everybody to back up so
22    another fight won't happen.
23        Q.    Okay.  And what about the person that you
24    saw throwing punches, did you watch him from the time
25    that you saw him throwing punches?
```

```
 1        A.     No.  After I saw him throwing punches, when
 2   I got off the ATV I didn't focus on him specifically.
 3   I just basically -- I wasn't there specifically to
 4   arrest defendant Gomez.  I was there -- my main focus
 5   was to back up the crowd so any officers won't get
 6   hurt.
 7        Q.     So that I'm clear, you saw Mr. Gomez
 8   assaulting another individual.  That's a crime, isn't
 9   it?
10        A.     Yes.
11        Q.     And notwithstanding your observation of an
12   individual committing a crime, you chose not to keep
13   your eye on that person or to attempt to arrest that
14   person at that time; is that an accurate statement?
15             MR. SWITKES:  Objection to form.
16             THE WITNESS:  At that point -- at that
17        point, yes.
18   BY MR. OSTROW:
19        Q.     Okay.  Now, if you saw someone assaulting
20   another person on your watch, isn't it your
21   responsibility to intervene and to stop that unlawful
22   activity?
23        A.     It depends on the situation.  In this
24   situation it was very chaotic as I said.  I couldn't
25   go directly to him at that time.  I had people in the
```

```
 1    way.  I had different crowds I had to back up for
 2    officer safety.
 3        Q.    For which officer's safety?
 4        A.    All the officers on the scene.
 5        Q.    Whose safety are we talking about
 6    specifically?
 7              MR. SWITKES:  Objection to form.
 8              THE WITNESS:  The officers and the subject.
 9    BY MR. OSTROW:
10        Q.    Well, tell me their names.
11        A.    I don't know who exactly was there.  I know
12    Chambers was there, Holbrook, Blanco.
13        Q.    So was Chambers in danger?
14              MR. SWITKES:  Objection to form.
15              THE WITNESS:  At the time of -- well,
16        depends which part you are talking about.
17    BY MR. OSTROW:
18        Q.    Well, I'm talking about when -- when you
19    approached the scene and got off your ATV.  Was
20    Chambers in danger?
21        A.    All the officers were in danger I believed.
22        Q.    You believed.  Did you see any weapons
23    anywhere?
24        A.    A lot of bottles in the area, glass bottles,
25    beer bottles.
```

```
 1          Q.     Did you see anyone throwing any beer

 2     bottles?

 3          A.     No.

 4          Q.     Okay.  Did you see any weapons?

 5          A.     No, besides the beer bottles.

 6          Q.     You saw some people drinking beer?

 7          A.     Yes.

 8          Q.     Did you hear any officers express that they

 9     felt they were in danger?

10          A.     No.

11          Q.     Were there any calls that you heard over

12     your radio of officer in danger?

13          A.     Eventually at one point somebody did say

14     315.  I don't -- it was after the initial call that

15     Sergeant Ruder called off, that somebody, a female

16     officer, I don't know who it was, said 315.  That

17     means emergency backup.

18          Q.     Okay.  Emergency backup.  But no one gave

19     you a call for an officer in danger, did they?

20               MR. SWITKES:  Objection to form.

21               THE WITNESS:  Besides that 315 call, no.

22     BY MR. OSTROW:

23          Q.     Is there a specific call for officer in

24     danger?

25          A.     315.
```

```
 1        Q.     Is that what that means, officer in danger
 2   or officer needs backup?
 3        A.     Officer needs backup as soon as possible.
 4        Q.     So that might mean an officer is in danger
 5   or that he sees a situation where he feels it requires
 6   more than one officer, correct?
 7        A.     It could go different ways.
 8        Q.     All right.
 9        A.     Could mean many things.
10        Q.     So it doesn't specifically mean that an
11   officer is in danger?
12        A.     Correct.
13        Q.     Did you see any officer as you approached
14   this scene, any officer being struck?
15        A.     No.  At that point, no.
16        Q.     Did you see anyone threaten any officer?
17             MR. SWITKES:  Objection to form.
18             THE WITNESS:  We heard several beachgoers
19        saying, you know, yelling that -- at that point
20        they weren't -- I don't know if they were yelling
21        at us, but they were saying, you know, what the
22        fuck are you doing, stuff like that.
23   BY MR. OSTROW:
24        Q.     No, that was later when you were pounding
25   Gomez, wasn't it?
```

Deposition of Andy Lozano                                    Steven Gomez vs. Andy Lozano

```
 1              MR. SWITKES:  Objection to the form of the
 2        question.  Argumentative and harassing.  We are
 3        not going to do that during this deposition.  If
 4        you want to ask a question and you are going
 5        chronologically, that's okay.  But you can't
 6        threaten the officer with that kind of question.
 7        It's totally inappropriate at the time your
 8        associate's snickering.
 9              MR. S. OSTROW:  I don't think it's
10        threatening.
11              MR. SWITKES:  Only one of you are going to
12        speak.
13              MR. S. OSTROW:  I just spoke.
14              MR. OSTROW:  You spoke to him first.
15              MR. SWITKES:  I assume that he's there to
16        help you, not snicker at my objection.
17              MR. S. OSTROW:  No one was snickering.
18              MR. SWITKES:  What was the noise you were
19        making during my objection?
20              MR. S. OSTROW:  I was laughing.
21              MR. SWITKES:  Okay.  Either one is
22        inappropriate.
23              MR. OSTROW:  Let's get back to your
24        objection.  If you have an objection, counsel,
25        then state the objection as opposed to an
```

1    instruction.  There are stated objections as you

2    know if you want to talk about being appropriate.

3        Number two, there is no threat to the

4    officer.  The officer pounded my client.  He's

5    already admitted that he pounded my client twice,

6    he broke his face and knocked his teeth out.

7    That's pounding.  During that time the testimony,

8    if you have gotten any of the witness statements,

9    you will hear that the crowd was upset with the

10   way the officers were attempting to make their

11   arrest and they voiced that.  So once you get up

12   to speed then you'll understand the questions that

13   are being asked.

14       MR. SWITKES:  Now on the record, there is no

15   testimony that my client pounded anybody.  There

16   is ample testimony from many witnesses as to

17   different versions that happened.  If counsel

18   believes it's appropriate to raise his voice and

19   say that my client pounded his client during the

20   deposition, we obviously have a difference of

21   opinion as to the way to conduct yourself during a

22   deposition which is why my objection contained

23   more than just objection to form.

24       If you think you are going to abuse my

25   client during the deposition by raising your voice

```
 1     and saying while you were pounding my client,

 2     we'll have an early exit and maybe a special

 3     master, general master will be appointed to

 4     oversee this.  I don't think that's necessary.

 5     I'm pretty sure there is no jury listening to

 6     this, so your attempt to influence somebody during

 7     the deposition by using that language is really

 8     ineffective.  So I'll make appropriate objections,

 9     you can ask appropriate questions, but the ground

10     rules are you are not going to raise your voice

11     and you are not going to --

12            MR. S. OSTROW:  This has to stop.

13            MR. OSTROW:  Let him going on.

14            MR. SWITKES:  You are not going to raise

15     your voice and tell my client he pounded your

16     client despite the fact that you think that's what

17     the record says, and you further think I don't

18     know what the record says and I have not reviewed

19     it before I got here.

20  BY MR. OSTROW:

21     Q.    How many times did you hit my client?

22     A.    At least twice.

23     Q.    How many times did you hit him in the ribs?

24     A.    I'm not sure how many times I hit him in the

25  ribs.  Less than -- maybe one or two times.
```

```
 1        Q.    Well, it wouldn't be less than one because

 2   you did at least in fact hit him one time in the ribs,

 3   correct?

 4             MR. SWITKES:  Objection, argumentative,

 5        harassing.  Answer the question.

 6             THE WITNESS:  Correct.

 7   BY MR. OSTROW:

 8        Q.    So you hit him in the ribs at least one

 9   time?

10        A.    Correct.

11        Q.    Maybe two times?

12        A.    Possibly.

13        Q.    Maybe three times?

14        A.    I wouldn't think so.

15        Q.    How many times did you strike him in the

16   face?

17        A.    Twice.

18        Q.    When you struck him in the face you struck

19   him as hard as you possibly could, correct?

20        A.    Yes.

21        Q.    And when you struck him in the ribs you

22   struck him as hard as you possibly could, correct?

23        A.    Yes.  From the position I was in on my

24   knees, yes.

25        Q.    When you struck him in the face he was on
```

```
 1    all fours, his hands and knees were on the sand,

 2    correct?

 3              MR. SWITKES:  Objection to form.

 4              THE WITNESS:  The second time I punched him

 5         in the face, both of his hands were not on the

 6         ground.

 7    BY MR. OSTROW:

 8         Q.    Where was the hand that wasn't on the

 9    ground?

10         A.    It was either pushing me away or throwing a

11    punch at me.

12         Q.    Oh, you think he tried to throw a punch at

13    you now?

14         A.    Yes.  He was kicking and throwing his

15    elbows, as well.

16         Q.    Was he kicking when his knees were on the

17    ground?

18         A.    Yes, he was.  He was flailing his legs.

19         Q.    While his knees were on the ground he was

20    flailing his legs?

21         A.    Correct.

22         Q.    I see.  And his elbows, he was flailing his

23    elbows, also?

24         A.    Yes.

25         Q.    And those were when his hands were on the
```

```
 1    ground?
 2        A.    No.
 3        Q.    When his chest was on the ground?
 4        A.    Yes.
 5        Q.    When you were sitting on his face?
 6             MR. SWITKES:  Objection to the form of the
 7        question.
 8             THE WITNESS:  I was not sitting on his face.
 9    BY MR. OSTROW:
10        Q.    Sitting on his head?
11             MR. SWITKES:  Objection to the form of the
12        question.
13             MR. OSTROW:  What's wrong with the form?
14             MR. SWITKES:  You're supposing that he was
15        sitting on his head, and I don't think the facts
16        are that he sat on his head.
17    BY MR. OSTROW:
18        Q.    Did you sit on his head?
19        A.    No.
20        Q.    Did you notice in the videotape where you
21    were sitting on his head?
22             MR. SWITKES:  Objection to form.
23             THE WITNESS:  It appeared that I was sitting
24        on his head, but I was not sitting on his head.
25
```

```
 1    BY MR. OSTROW:

 2        Q.    Okay.  I see.

 3             And while it appeared that you were sitting

 4    on his head, is that when he was throwing his elbows?

 5        A.    At that point -- I believe he was at that

 6    point, yes.

 7        Q.    Okay.  And you felt in danger while -- while

 8    it appeared that you were sitting on his head, were

 9    his shoulders in contact with the sand?

10             MR. SWITKES:  Objection to form.

11             THE WITNESS:  I don't remember.

12    BY MR. OSTROW:

13        Q.    When it appeared that you were sitting on

14    his head, what were you sitting on?

15        A.    I had my knees on the sand.  My butt was not

16    touching the ground or his head.

17        Q.    So at some point he was on his hands and his

18    knees when you threw your first punch.  Was that the

19    punch that broke the orbit in his face?

20             MR. SWITKES:  Objection to form.

21             THE WITNESS:  I don't know.

22    BY MR. OSTROW:

23        Q.    Okay.  Well, was it the first or the second

24    punch that knocked his teeth out?

25             MR. SWITKES:  Objection to form.
```

```
 1        Argumentative.

 2              THE WITNESS:  I don't know.  Could have been

 3        my punch, could have been the fight he was

 4        involved in before.  I don't know what knocked his

 5        teeth out.

 6   BY MR. OSTROW:

 7        Q.    Do you recall testifying in your prior

 8   deposition that when you first observed him his teeth

 9   hadn't been knocked out?

10        A.    I didn't testify that.  I testified saying

11   that I did punch his teeth out, not that I saw him

12   with all his teeth before.

13        Q.    Okay.

14        A.    To the best of my knowledge that's what I

15   testified to.

16        Q.    I see.  So is it your statement now that --

17   that when you knocked his teeth out he might have

18   already had his teeth knocked out?

19              MR. SWITKES:  Objection to form of the

20        question.  Argumentative.  Answer to the best of

21        your ability.

22              THE WITNESS:  It was possible.

23   BY MR. OSTROW:

24        Q.    What's probable?

25              MR. SWITKES:  Objection to the form.
```

```
 1              THE WITNESS:  I don't know.
 2    BY MR. OSTROW:
 3       Q.    As you and the other officers punched and
 4    continued to punch Mr. Gomez in his body and his face,
 5    did he plea for help?
 6              MR. SWITKES:  Objection to the form of the
 7        question.  Argumentative.
 8              THE WITNESS:  No.
 9    BY MR. OSTROW:
10       Q.    Did he plea for you to stop?
11              MR. SWITKES:  Objection to the form of the
12        question.
13              THE WITNESS:  Yes.
14    BY MR. OSTROW:
15       Q.    How many times did he ask you to stop?
16       A.    I don't know.
17       Q.    Notwithstanding him asking you to stop, did
18    you go on and continue to strike him further as he was
19    asking you to stop?
20       A.    As he was saying to stop, he was still
21    kicking his feet.
22       Q.    Was his face buried in the sand at that
23    point?
24       A.    I would not consider it buried in the sand.
25    At one point his face touched the sand.
```

```
 1         Q.    Did you see the photographs of him with sand

 2   on his face?

 3         A.    Yes.

 4         Q.    And how -- do you think that sand was thrown

 5   on his face or it came on his face when his face was

 6   in the sand?

 7              MR. SWITKES:  Objection to the form of the

 8         question.  Argumentative and harassing.  If this

 9         continues, it will not be long before we leave.

10              MR. OSTROW:  Counsel, if you believe that my

11         questions have been harassing or argumentative

12         then you can go ahead and terminate this

13         deposition and ask for the Court to appoint

14         whoever you want to appoint.  And let the Court

15         read the transcript and see if they are harassing

16         or see if they are an attempt to get a officer

17         with a convenient memory to answer the questions.

18              MR. SWITKES:  You are also being insulting.

19         I don't know what you think this transcript is

20         going to show, but you can conduct this deposition

21         as a deposition and when you get in front of a

22         jury you can do all the things you are trying to

23         do to prejudice the jury.  Not going to happen

24         today.  If you insult me or insult the officers,

25         we'll leave.  This is a deposition.  Conduct
```

```
 1        yourself accordingly and we'll be able to do this

 2        in a reasonable amount of time.  You don't have to

 3        insult him.  You don't have to insult me.

 4              MR. OSTROW:  And you don't have to insult

 5        me.

 6              MR. SWITKES:  That's true.

 7              MR. OSTROW:  Okay.

 8  BY MR. OSTROW:

 9        Q.    Officer Lozano, do you feel that I'm

10  harassing you?

11        A.    In a way, yes.

12        Q.    How is that?

13        A.    Just -- I don't know.  I feel like you are

14  putting pressure on me.

15        Q.    I intend to put pressure on you.  That's the

16  nature of a deposition.  Is that the way you feel I'm

17  harassing you?

18        A.    Yes.

19        Q.    So let's get back to the point where he's

20  got both his hands and both his knees on the sand and

21  you punched his face as hard as you could, correct?

22              MR. SWITKES:  Objection to the form of the

23        question.

24  BY MR. OSTROW:

25        Q.    Is that correct?
```

1        MR. SWITKES:  Assumes facts not in evidence.

2   BY MR. OSTROW:

3        Q.    Is that a correct statement?

4        A.    As hard as I could from the position I was

5   in, yes.

6             MR. OSTROW:  What facts aren't in evidence?

7             MR. SWITKES:  That your client had both

8        hands on the ground and both legs on the ground

9        when he was punched in the face.  In fact, the

10       physical evidence is quite contrary to that.

11            MR. OSTROW:  Well, the officer's just agreed

12       that when he first punched my client my client's

13       hands and knees were touching the sand.

14            MR. SWITKES:  Do you want to have a

15       discussion with me about what the tape shows which

16       is going to prove what the evidence is and what

17       things happened at what sequence?

18   BY MR. OSTROW:

19       Q.    At any time while you or the other officers

20   were punching Mr. Gomez, did Mr. Gomez attempt to

21   guard himself?

22       A.    To the best of my knowledge, I don't recall

23   him guarding himself.

24       Q.    Okay.  And if a witness testified that

25   Mr. Gomez was trying to guard himself and pulled up

```
 1   into a fetal position while he was still being struck,

 2   would you disagree with that testimony?

 3       A.    I'm sorry.  Can --

 4             MR. SWITKES:  Objection to form.

 5             THE WITNESS:  Can you repeat that question?

 6             MR. OSTROW:  Yes.  The reporter will read it

 7       back.

 8             (Thereupon, a portion of the record was read

 9   by the reporter.)

10             THE WITNESS:  Yes.

11   BY MR. OSTROW:

12       Q.    Okay.  Which part of that testimony would

13   you disagree with?

14       A.    He was not in a fetal position.

15       Q.    So it's your testimony that at no time

16   Mr. Gomez assumed the fetal position?

17       A.    Correct.

18       Q.    Okay.  The two positions that you've

19   testified to him being in after he was taken to the

20   ground was either laying flat on his stomach or on his

21   hands and knees or one hand and knee; is that correct?

22             MR. SWITKES:  Objection to form.

23             THE WITNESS:  Yes.

24   BY MR. OSTROW:

25       Q.    And am I correct that at no time during the
```

```
 1    time that you were with Mr. Gomez was he on his feet?
 2              MR. SWITKES:   Objection to form.
 3              THE WITNESS:   No.  When I made contact with
 4       him, no.
 5    BY MR. OSTROW:
 6       Q.    And the only time that he was on his feet
 7    while you were in contact with him was after he was
 8    handcuffed and lifted to the standing position,
 9    correct?
10       A.    Yes.
11       Q.    Okay.  And you would agree with me that at
12    no time did Mr. -- in your presence did Mr. Gomez
13    attempt to flee?
14       A.    No.
15       Q.    You agree with me?
16       A.    Yes.  Not flee, but he would not put his
17    hands behind his back.
18       Q.    Okay.
19       A.    I don't know if he was trying to flee, but
20    when he was trying to get up it could have been that
21    he was trying to flee.  I didn't believe that he was
22    going to try to flee the scene.
23       Q.    Other than hearing Mr. Gomez yell "stop" on
24    more than one occasion, what else did you hear
25    Mr. Gomez say while he was surrounded by police
```

```
 1    officers?

 2            MR. SWITKES:  Objection to the form of the

 3        question.

 4            THE WITNESS:  To the best of my knowledge at

 5        the time I couldn't hear anything else from the

 6        defendant.

 7    BY MR. OSTROW:

 8        Q.    Okay.  While you were in the presence of

 9    Mr. Gomez before he was handcuffed, did you hear

10    anything that anyone in the crowd yelled at you?

11        A.    I heard several beachgoers yelling what the

12    fuck are you doing?  Get off him.  Just like it says

13    in the video.  Not those exact words, but similar to

14    that.

15        Q.    Before you made contact with Mr. Gomez and

16    when you first approached the scene of the

17    disturbance, did you see anyone throwing punches other

18    than who you believe was Mr. Gomez?

19        A.    No.

20        Q.    And how many people was he fighting with?

21        A.    I'm not sure.

22        Q.    Was it more than one?

23        A.    I don't know.  I don't remember.

24        Q.    More than two?

25        A.    I don't remember.
```

 1       Q.     Did you know at any time?

 2       A.     No.

 3       Q.     You didn't know at any time how many people

 4   he was throwing punches at?

 5              MR. SWITKES:   Objection, repetitious.

 6              THE WITNESS:   No.

 7   BY MR. OSTROW:

 8       Q.     Can you describe any of the people that you

 9   claim Mr. Gomez was throwing punches at?

10       A.     No.

11       Q.     Who was the first person to your knowledge

12   to come to the scene in this crowd, first officer?

13       A.     Not sure.

14       Q.     Who did you receive the call from?

15       A.     Sergeant Ruder.

16       Q.     And at the time that you heard that call

17   from Sergeant Ruder you were five blocks away from the

18   incident, correct?

19       A.     Approximately five blocks.

20       Q.     When you say "approximately", what do you

21   mean by "approximately"?  You were at what street?

22              MR. SWITKES:   Objection to the form of the

23         question.  The answer couldn't be more clear.  If

24         you can answer any better, you can.

25              THE WITNESS:   Could be approximately, you

```
 1        said five, I said five before.  Could be three,

 2        five, five.  Six even.

 3   BY MR. OSTROW:

 4        Q.    You are north of the scene.  There is a

 5   public restroom that's north of the scene on the

 6   beach.  At what street is that?

 7        A.    I don't -- I'm not sure.

 8        Q.    Is there any other building on the beach

 9   north of the lifeguard station?

10        A.    I'm not sure.

11        Q.    Well, do you recall testifying about that in

12   your prior deposition?

13        A.    I remember testifying that the restrooms are

14   on 14th Street.

15        Q.    Okay.

16        A.    That's not that close to the scene.

17        Q.    Okay.  The restrooms on 14th Street, at the

18   time that you got the call were you north or south of

19   the restrooms?

20        A.    I was south of them.

21        Q.    Okay.  And the lifeguard station is at

22   approximately what street?

23        A.    Approximately 8th Street.

24        Q.    Okay.  So if you were five blocks north, you

25   would be at 13th Street where the restrooms were,
```

1    correct?

2        A.    Yes.  But I wasn't specifically on 13th

3    Street.  I was in that general area.

4        Q.    Okay.  And from that area were you able to

5    see the disturbance or were you too far to see it from

6    where you were when you first got the call?

7        A.    From that area I don't remember being able

8    to see the scene.

9        Q.    Now, you filled out an arrest form.  Did you

10   fill out the arrest affidavit?

11       A.    For Steven Gomez, yes.

12       Q.    Do you have a copy of it there, the arrest?

13       A.    This is another Steven Gomez.  This is the

14   wrong Steven Gomez.

15       Q.    You have the right one there in front of

16   you?

17       A.    Yes.

18       Q.    And may I see it?  When you fill out a

19   complaint or arrest affidavit, would you agree it's

20   important to include all relevant acts of a defendant

21   that may constitute a crime?

22       A.    Yes.

23             MR. SWITKES:  Objection to form.

24             THE WITNESS:  Yes.

25

```
 1    BY MR. OSTROW:

 2        Q.    Did you do that when you filled that out?

 3        A.    I didn't put specific details on it.

 4        Q.    And why not?

 5        A.    I made the mistake of not speaking to

 6    Officer Chambers to see what kind of contact they had.

 7        Q.    Okay.  Other than what contact Officer

 8    Chambers might have had, what other important details

 9    did you not include in the arrest affidavit?

10            MR. SWITKES:  Objection to the form.

11            THE WITNESS:  To my knowledge that's it.

12    BY MR. OSTROW:

13        Q.    So that any acts of the defendant that would

14    constitute a crime were important to put in that

15    affidavit, and you put them in that affidavit,

16    correct?

17        A.    Yes.

18        Q.    Those that you observed?

19        A.    Yes.

20        Q.    Because certainly you can't be held

21    responsible to put down what somebody else observed,

22    correct?

23        A.    Correct.

24        Q.    Now, would you point out in that arrest

25    affidavit where Steven Gomez was throwing punches at
```

```
 1    another beachgoer?
 2        A.    At another beachgoer?  No, I didn't put
 3    that, that I observed it.
 4        Q.    Okay.  Yet that would be a crime?
 5        A.    Yes.
 6        Q.    And it's important?
 7        A.    Yes.
 8        Q.    But you didn't put it down?
 9        A.    Correct.
10        Q.    Okay.  In your prior deposition you said
11    that some beachgoers said to you look, they are
12    fighting over there.  Do you recall that testimony?
13        A.    Something to that effect of there were --
14    that's the person that was involved in the fight.
15    Maybe not so much they are fighting over there, but
16    that that person was involved in a fight.
17        Q.    Okay.  So that if in the prior deposition
18    you stated that you were told by beachgoers that
19    quote, "look, they are fighting over there", that
20    was --
21        A.    That might have been when Blanco was taking
22    Gomez to the ground.  That might have been what was
23    said.  That might have been, you know, that's the
24    fight over there, that's the officer that was taking
25    him down.
```

```
 1        Q.     Well, what was it?

 2        A.     That might have been why I said that.

 3        Q.     That might have been why you said that or

 4    that was why you said that?

 5               MR. SWITKES:  Objection to form.

 6               THE WITNESS:  That might have been why I

 7        said that.

 8    BY MR. OSTROW:

 9        Q.     What are the other possibilities of why you

10    said that?

11               MR. SWITKES:  Objection to form.

12               THE WITNESS:  I don't know.

13    BY MR. OSTROW:

14        Q.     Would one of the other possibilities be to

15    justify your conduct that day?

16               MR. SWITKES:  Objection to form.

17        Argumentative.  Harassing.

18               THE WITNESS:  I don't know.

19    BY MR. OSTROW:

20        Q.     Did a beachgoer say that to you, look, they

21    are fighting over there?

22        A.     Something to that effect.

23        Q.     Did one or more beachgoers say that to you?

24        A.     I know there were several beachgoers

25    pointing.  I don't know how many people said that.
```

```
 1        Q.     When were they pointing?

 2        A.     When Gomez was trying to leave the scene.

 3        Q.     So that was after you saw Gomez throwing

 4   punches?

 5        A.     Yes.

 6        Q.     So as he was leaving the scene a beachgoer

 7   said to you look, they are fighting over there?

 8             MR. SWITKES:  Objection to form.

 9             THE WITNESS:  No.  As he was leaving the

10        scene one of the beachgoers said look, he's

11        leaving the scene.

12   BY MR. OSTROW:

13        Q.     Why didn't you charge Mr. Gomez with assault

14   if you saw him throwing punches at somebody?

15        A.     Because I initially wasn't going to arrest

16   him for assault.

17        Q.     But you ultimately did arrest him?

18        A.     Yes.

19        Q.     In your prior deposition I asked you who did

20   they advise was involved in a fight, and you said they

21   advised all of us.  They said look, they are fighting

22   over there, they are fighting over there.

23             Is that truthful testimony?

24        A.     Yes.

25        Q.     And was there a fight going on when you were
```

1   told look, they are fighting over there?

2       A.    That must have been when defendant Gomez was

3   taken to the ground.

4       Q.    You say they advised all of us.  So you are

5   talking about beachgoers advising you of something,

6   right?  As well as advising the other officers of

7   something, correct?

8       A.    Yes.

9       Q.    Okay.  They said look, they are fighting

10  over there, they are fighting over there.  And you

11  believe that was when the beachgoers were telling you

12  that -- who was fighting?

13      A.    Like I said before, that could have been

14  when defendant Gomez was taken down to the ground.

15      Q.    All right.  So when he said look, they are

16  fighting over there, you believe they were referring

17  to the officers taking Mr. Gomez to the ground?

18           MR. SWITKES:  Objection to the form of the

19      question.

20           THE WITNESS:  Yes.  That's when I ran over

21      there.

22  BY MR. OSTROW:

23      Q.    And then you were asked, I said you saw them

24  fighting over there, and you said yes.  And then I

25  asked and Chambers was with you at that point in time?

```
 1    Yes.  Is that your testimony?
 2              MR. SWITKES:  Counsel, can you tell me what
 3         page and line you are reading from?  You didn't
 4         take that deposition, someone else did.
 5              MR. OSTROW:  I'm on page 22.
 6              MR. SWITKES:  Okay.
 7    BY MR. OSTROW:
 8         Q.    And Chambers was with you at that point in
 9    time?  And you said yes.  Correct?
10              MR. SWITKES:  Objection to form.
11              THE WITNESS:  He could have been in the area
12         with me, not right next to me, but --
13    BY MR. OSTROW:
14         Q.    Okay.  And then the next question was so he
15    obviously saw the fight?  And you said yes.
16         A.    I was assuming that he saw the fight.  I
17    can't really say what he saw.  That was an assumption.
18         Q.    And when you say "they advised all of us",
19    who were you referring to?
20              MR. SWITKES:  What page are you referring
21         to?
22              MR. OSTROW:  Page 22.
23              THE WITNESS:  I was referring to the
24         officers.
25
```

Deposition of Andy Lozano                                    Steven Gomez vs. Andy Lozano

```
 1    BY MR. OSTROW:

 2        Q.     You and Chambers?

 3        A.     Whoever was there that heard it.  I don't

 4    know.  I can't say who heard beachgoers say that,

 5    but --

 6        Q.     They advised all of us.

 7               Other than Officer Chambers, who else to

 8    your knowledge was advised that there was a fight

 9    going on?

10        A.     I can't say who specifically heard that, but

11    there were other officers there.

12        Q.     And Officer Chambers wouldn't have been one

13    because he would have been the one, according to

14    beachgoers, who was involved in the fight.  Because

15    you were talking about the fight being the take-down.

16        A.     Yes.

17        Q.     So it couldn't have been him.  Who else?

18        A.     Whoever was around me that could have heard

19    it.

20        Q.     Couldn't have been Ruder, could it?

21        A.     I don't know.  I don't know where he was.

22        Q.     So I'm a little unclear about one point.

23    You never spoke to any of the beachgoers, correct?

24        A.     Correct.

25               MR. OSTROW:  Okay.  Mark this as Exhibit 2.
```

```
 1              (The document referred to was thereupon

 2       marked as Deposition Exhibit 2 for identification)

 3   BY MR. OSTROW:

 4       Q.    Officer Chambers got to the scene before you

 5   did, correct?

 6       A.    I believe so.

 7       Q.    Well, who did the take-down?

 8             MR. SWITKES:  Object to the form.

 9             THE WITNESS:  Let me -- let me look at my

10       OIR real quick.  Officer Blanco is the one that

11       took defendant Gomez down.

12   BY MR. OSTROW:

13       Q.    Okay.  And Officer Chambers was the first

14   officer to come in contact with Mr. Gomez?

15       A.    Yes.

16       Q.    Officer Chambers then was there at the scene

17   before you got to the scene, correct?

18       A.    Yes, possibly.

19       Q.    Well, was he or wasn't he?

20             MR. SWITKES:  Objection to form.

21             THE WITNESS:  It's possible that he was

22       there before me.  I'm assuming he was there before

23       me.

24   BY MR. OSTROW:

25       Q.    Now as you observed this large crowd, was
```

Deposition of Andy Lozano                                    Steven Gomez vs. Andy Lozano

```
 1   Gomez in the center of the crowd, to the left of the

 2   crowd, to the right of the crowd, to the front of the

 3   crowd or to the back of the crowd?

 4           MR. SWITKES:  Objection to form.

 5           THE WITNESS:  I'm not sure.

 6   BY MR. OSTROW:

 7       Q.    Why are you unsure?

 8           MR. SWITKES:  Objection to form.

 9       Argumentative, harassing.

10           THE WITNESS:  It was a big crowd.  It was

11       chaotic.  I don't recall exactly where he was

12       standing.

13   BY MR. OSTROW:

14       Q.    Okay.  I think you also told me earlier you

15   don't remember whether he was facing you or had his

16   back to you; is that correct?

17       A.    Correct.

18       Q.    Sometime after that you saw Officer Chambers

19   grab one of Mr. Gomez's hands, correct?

20       A.    Yes.

21       Q.    Was it his right hand or his left hand?

22       A.    I don't recall.

23       Q.    At the time that you made that observation,

24   was Mr. Gomez facing you or did he have his back to

25   you or his side to you?
```

```
 1       A.    I don't recall.

 2       Q.    How about Officer Chambers?  Was his back to

 3   you or his face to you or his side to you?

 4       A.    I don't recall.

 5       Q.    Why don't you recall any of those facts?

 6             MR. SWITKES:  Objection to the form of the

 7       question.  Harassing, argumentative.  He's giving

 8       you his best answers, counsel.

 9             THE WITNESS:  It was a very chaotic scene

10       like I've said.  I wasn't focusing on the position

11       that he was facing.  I was focusing on the crowd

12       that was around that situation.

13   BY MR. OSTROW:

14       Q.    When you tried to cuff Mr. Gomez he was on

15   his stomach, correct, initially?

16       A.    Yes.

17       Q.    Okay.  When Gomez was screaming stop, stop,

18   stop, what did you think he wanted you to stop doing?

19             MR. SWITKES:  Objection to the form of the

20       question.  Calls for the state of mind of someone

21       other than the deponent.

22             THE WITNESS:  I don't know what he wanted me

23       to stop.  I guess stop trying to handcuff him.  I

24       don't know.  Maybe he didn't know I was a police

25       officer.  Maybe he was too intoxicated.  Maybe he
```

```
 1        didn't know who I was.

 2             MR. SWITKES:  I'm going to have to take a

 3        break, counsel.

 4             (Thereupon, a short recess was taken, after

 5        which the following proceedings were held:)

 6   BY MR. OSTROW:

 7        Q.    Is your memory of the events better today

 8   than it was on May 26 of 2009?

 9        A.    It would be about the same.

10        Q.    At the time of this incident you had your

11   uniform on, correct?

12        A.    Correct.

13        Q.    You had your officer's belt on with all its

14   accessories?

15        A.    Yes.

16        Q.    And what accessories were on the belt?

17        A.    To the best of my knowledge I had a baton,

18   handcuffs, firearm, pepper spray.

19        Q.    Okay.  What is the purpose of the pepper

20   spray?

21        A.    To be able to control somebody in a certain

22   situation where they won't be able to see for a

23   certain amount of time.

24        Q.    You use it to control a suspect without

25   injuring the suspect, correct?
```

```
 1              MR. SWITKES:  Objection to form.

 2    BY MR. OSTROW:

 3       Q.    Okay.

 4              MR. SWITKES:  Sorry, counsel.  I was waiting

 5       for this call.

 6              (Thereupon, a short recess was taken, after

 7       which the following proceedings were held:)

 8              MR. SWITKES:  I apologize.  Thank you.

 9    BY MR. OSTROW:

10       Q.    When Mr. Gomez attempted to get up on his

11    knees, at that point in time had he done anything that

12    you considered to be violent towards you?

13       A.    Towards me?  No.  But towards Officer

14    Blanco, yes.

15       Q.    And did that occur before he tried to get up

16    on his knees?

17       A.    I'm sorry.  Repeat the question.

18       Q.    Did the violence occur before he tried to

19    get up off his back?

20       A.    Yes.

21       Q.    If you testified in your prior deposition

22    that you were sitting on Mr. Gomez's head, would that

23    have been untruthful?

24              MR. SWITKES:  Objection to the form.

25              THE WITNESS:  Not untruthful, but it
```

```
 1        appeared that I was sitting on his head when part
 2        of my pants were touching his head, not my butt
 3        pushing down on his head.
 4   BY MR. OSTROW:
 5        Q.    Well, let me read you a question and answer
 6   and see if you can explain it to me.
 7             MR. SWITKES:  What page?
 8             MR. OSTROW:  Page 40, line 14.
 9   BY MR. OSTROW:
10        Q.    Now you are trying to grab him, you are
11   still sitting on his head, correct?  Answer, correct.
12             MR. SWITKES:  Counsel, why don't you read
13        the lines before that and put it in context.
14        Because if you start on 8 it says exactly what he
15        testified to.
16             MR. OSTROW:  If you have an objection, state
17        the objection without coaching the witness.  The
18        next time you do it I'm going to terminate and ask
19        the Judge to appoint a master just like you were
20        going to ask the Judge to appoint a master.
21             MR. SWITKES:  I think I made an appropriate
22        objection.  And if we were in trial the Judge
23        would make you read the sentences before so you
24        are not reading it out of context.
25
```

```
 1    BY MR. OSTROW:
 2        Q.    Question, line 8.  Now, where are you
 3    sitting at this particular point in time?  Answer,
 4    looks like I'm sitting on his head.  You are sitting
 5    on his head, correct?  That's when he's screaming
 6    stop, stop?  Answer, yes.
 7              You are sitting on his head and he's saying
 8    "stop, stop", and you said "yes".  Do you remember
 9    that testimony?
10              MR. SWITKES:  Objection to the form of the
11         question.
12              THE WITNESS:  Yes.
13              MR. OSTROW:  I've read the prior testimony.
14              MR. SWITKES:  It says it looks like I'm
15         sitting on his head.
16              MR. OSTROW:  He's confirmed sitting on his
17         head.  I'm not going to argue with you.
18              MR. SWITKES:  It's argumentative, and you
19         can say whatever you want.
20              MR. OSTROW:  You can say whatever you want,
21         try to arrange reality.  The kid tried to breathe
22         and got his face punched for it.  That's what
23         happened in the tape.  Watch the tape.
24              MR. SWITKES:  In answer to that, that's the
25         last time you are going to raise your voice and
```

Deposition of Andy Lozano                                      Steven Gomez vs. Andy Lozano

```
 1    make obnoxious comments.
 2           MR. S. OSTROW:  He did not raise his voice.
 3           MR. SWITKES:  Put your name on the record.
 4           MR. OSTROW:  He's Steven Ostrow.  He's
 5    co-counsel in this case.
 6           MR. SWITKES:  There are two people
 7    objecting.
 8           MR. S. OSTROW:  I didn't object.
 9           MR. OSTROW:  He's an observer that's
10    pointing out when you say I'm raising my voice
11    you're lying.
12           MR. SWITKES:  We have another person who is
13    an officer, thank God, who won't be able to play
14    the tag team that you will be doing and making
15    obnoxious comments.  You want to say whatever you
16    think the facts are.  I've watched the video.
17    Don't tell me when I've watched the video.
18    Everybody in the room has watched the video except
19    the court reporter.  Your interpretation of what
20    are the facts are fine.  You are an advocate for
21    your client.  You are not selling the case to the
22    jury today.  You can certainly terminate the
23    deposition.
24           MR. OSTROW:  And you can do it if in your
25    opinion I am acting inappropriately.
```

```
 1            MR. SWITKES:  You are.  You are raising your

 2       voice, yelling, and telling us what the facts are

 3       from your opinion.  And we frankly do not care.

 4       It's inappropriate.

 5            MR. OSTROW:  I have yet to yell.  If I

 6       yelled, you would hear my yell.  I've not yelled,

 7       I've not raised my voice inappropriately other

 8       than a normal question on occasion, something is

 9       accentuated.

10            MR. SWITKES:  You have raised your voice on

11       multiple occasions.

12            MR. OSTROW:  Counsel, adjust your hearing

13       aid.

14            MR. SWITKES:  Another obnoxious comment

15       which will obviously be on the record.

16  BY MR. OSTROW:

17       Q.   Do you agree that it took you three to four

18  minutes after you heard the call to get to the scene?

19       A.   Approximately.

20       Q.   Did internal affairs tell you why they were

21  postponing your statement?

22            MR. SWITKES:  I'm going to instruct you not

23       to answer.  During an investigation of internal

24       affairs it's not to be discussed in any matter.

25       It's inappropriate and is an offense.
```

```
 1              MR. OSTROW:   Internal affairs has 90 days

 2        within which to complete their investigation.  If

 3        they don't do it within 90 days, the investigation

 4        is open to the public.

 5              MR. SWITKES:  You don't know the time

 6        frames.  You are obviously misinformed.   An

 7        officer is not allowed to discuss an ongoing

 8        internal affairs investigation.

 9              MR. OSTROW:   That's based what?  It's not in

10        the statute.

11              MR. SWITKES:  Counsel, your interpretation

12        of the statute is yours.  My interpretation is

13        different obviously.

14              MR. OSTROW:   We'll let the Court interpret

15        it.  Certify the question.

16   BY MR. OSTROW:

17        Q.    Have you spoken to anyone who has given a

18   statement to internal affairs?

19        A.    No.

20        Q.    Do you know when the internal affairs

21   investigation began?

22        A.    No.

23        Q.    When were you first contacted by internal

24   affairs?

25        A.    I got a notice in my mailbox.  I'm not sure
```

```
 1    if it was last week or the week before.

 2          Q.     Was that the first notice you got from them?

 3          A.     Yes.

 4          Q.     Am I correct in my assumption that when you

 5    claim you first saw the crowd and you saw someone in

 6    red shorts throwing punches you did not see the face

 7    of the person throwing punches?

 8                 MR. SWITKES:   Objection to form.

 9    BY MR. OSTROW:

10          Q.     Is that correct?

11          A.     Correct.   To the best of my knowledge that

12    was the subject that was throwing punches at the time.

13          Q.     Let's talk about your knowledge because you

14    keep saying to the best of your knowledge that was the

15    subject.

16                 Were the shorts the same exact color?

17          A.     Yes.

18          Q.     Okay.   Now, if Sergeant Ruder has testified

19    that by the time he called for help, the call that you

20    responded to, the crowd had disbursed and there were

21    no fights going on, whose recollection would you rely

22    on more of whether Mr. Gomez was throwing punches, his

23    or yours?

24                 MR. SWITKES:   Objection, argumentative.

25          Assumes facts not in evidence.
```

```
 1              THE WITNESS:  I can only say what I saw when
 2      I saw it.  I can't say what Sergeant Ruder saw.
 3  BY MR. OSTROW:
 4      Q.   Do you have any reason to challenge Sergeant
 5  Ruder's powers of observation?
 6              MR. SWITKES:  Objection to form.
 7              MR. OSTROW:  What's wrong with the form?
 8              MR. SWITKES:  You are asking for the state
 9      of mind of someone other than the deponent.
10              MR. OSTROW:  I'm not asking for any state of
11      mind.  I'm asking for powers of observation.
12              MR. SWITKES:  Powers of observation of
13      someone other than the deponent.
14  BY MR. OSTROW:
15      Q.   Have you ever heard anybody else suggest
16  that Sergeant Ruder wasn't an observant police
17  officer?
18              MR. SWITKES:  Objection to form.
19              THE WITNESS:  No.
20              MR. OSTROW:  What's wrong with the form of
21      that question?
22              MR. SWITKES:  Counsel, you keep badgering
23      this witness about what other people are and could
24      be and could see and might have said.  It's
25      inappropriate.
```

```
 1                  MR. OSTROW:  What's wrong with the form?
 2                  MR. SWITKES:  That's what's wrong with the
 3          form.
 4                  MR. OSTROW:  That's not a form objection.
 5                  MR. SWITKES:  You asked me for an
 6          explanation.  If you don't like it, that's your
 7          prerogative.
 8                  MR. OSTROW:  Well, I asked you because under
 9          the rules if I'm able to correct the form that you
10          challenged, then I would want to do that rather
11          than --
12                  MR. SWITKES:  That's why I gave you an
13          explanation.
14      BY MR. OSTROW:
15          Q.    Has any other officer told you that he saw
16      Mr. Gomez throw a punch at anybody?
17          A.    No.
18          Q.    Have you asked any other officers if they
19      did?
20          A.    No.
21          Q.    When you prepared the arrest report, did you
22      do it in conjunction with any other officer?
23          A.    With Officer Blanco.
24          Q.    Okay.  So you and Officer Blanco sat
25      together and filled out the paperwork?
```

```
 1      A.     Yes.

 2      Q.     Anyone else?

 3      A.     To my knowledge I don't believe there was

 4   anybody else in the room.

 5      Q.     Okay.  Have you seen the arrest report on

 6   the other Steven Gomez?

 7      A.     No.

 8      Q.     Do you recognize the signatures of any of

 9   the officers on that report?

10      A.     Detective Holbrook.

11      Q.     Have you spoken to Detective Holbrook about

12   this incident?

13      A.     No.

14      Q.     Was Detective Holbrook at the scene of this

15   disturbance before you?

16      A.     I don't know if he was there before me or

17   not.  At one point he was there.

18      Q.     At what point did you notice he was there?

19      A.     After everything calmed down.

20      Q.     And by everything calming down, does that

21   mean after you effectuated the arrest on Mr. Gomez?

22      A.     Yes.

23      Q.     Prior to the time that you charged my client

24   with disorderly intoxication, did you test his blood

25   for alcohol?
```

```
1       A.    No.

2       Q.    Did you do a field sobriety test?

3       A.    No.

4       Q.    In your police training, are you trained on

5   how to determine whether a suspect is intoxicated?

6       A.    For DUI cases, yes.

7       Q.    Is there a different manner in which to do

8   it if the person isn't driving?

9       A.    I don't believe so.

10      Q.    And what is your understanding of why you

11  perform whatever tests that you perform on a driver to

12  determine if the driver was intoxicated?

13      A.    I'm not too familiar with those tests.  I've

14  only done that once.  After that I haven't -- I don't

15  deal with DUIs.

16      Q.    How long ago was it that you were trained as

17  a police officer?

18      A.    The academy has been a little over two and a

19  half years ago.

20      Q.    And the testing of subjects for sobriety was

21  a subject at the academy, correct?

22      A.    Yes.

23      Q.    They taught you how to do it?

24      A.    Yes.

25      Q.    Okay.  And they taught you why you do it,
```

```
 1    told you why you do it, correct?

 2        A.    Yes.

 3        Q.    And in that two and a half years you've

 4    forgotten?

 5              MR. SWITKES:  Objection to the form.

 6        Argumentative and harassing.

 7              THE WITNESS:  It's nothing that I practice

 8        on a regular basis.  I don't deal with DUI cases.

 9    BY MR. OSTROW:

10        Q.    And is that why you have forgotten how to do

11    it?

12              MR. SWITKES:  Objection to form.

13              THE WITNESS:  Yes.

14    BY MR. OSTROW:

15        Q.    And notwithstanding, you still were aware

16    that if you were going to charge someone with

17    intoxication, a time would come when you would have to

18    prove that fact, correct?

19              MR. SWITKES:  Objection to the form of the

20        question.

21              THE WITNESS:  No.  To the best of my

22        knowledge he was intoxicated.  Normally for -- to

23        charge somebody with disorderly intoxication we

24        don't -- at least I myself don't test somebody to

25        see if they are intoxicated.
```

```
 1    BY MR. OSTROW:

 2        Q.     Would you agree with me that when you charge

 3    someone with a crime, you do so with the ultimate

 4    intent of assisting the prosecuting authorities in

 5    proving their case, correct?

 6        A.     Yes.

 7        Q.     That's one of the things police officers do,

 8    correct?

 9        A.     Yes.

10        Q.     They gather evidence?

11        A.     Yes.

12        Q.     Because when you charge someone with a crime

13    you can't prove it on assumptions or guesses.  You

14    must prove it with evidence, correct?

15        A.     Yes.

16        Q.     And in the case of intoxication the evidence

17    would be a blood test or a field sobriety test,

18    correct?

19            MR. SWITKES:  Objection to form.

20            THE WITNESS:  On some cases, yes.

21    BY MR. OSTROW:

22        Q.     Okay.  What cases other than that -- in what

23    other cases do you not do it?

24            MR. SWITKES:  Objection to form.

25
```

```
 1   BY MR. OSTROW:
 2       Q.    In what cases don't you require evidence?
 3            MR. SWITKES:  Objection to form.
 4            THE WITNESS:  For the field sobriety test,
 5       normally you do that on DUI cases.  Not this
 6       intoxication.
 7   BY MR. OSTROW:
 8       Q.    So is it your practice that -- that you
 9   never test anybody for intoxication if they weren't
10   driving, you just rely on your own testimony before a
11   jury that they were intoxicated?
12       A.    No.  If it's a DUI case, I would get
13   somebody who is very knowledgeable in that, in a field
14   sobriety test, things of that nature, blood test.
15       Q.    Otherwise, if it's a DUI case how do you
16   intend to prove to somebody what you are charging them
17   with?
18       A.    There's other signs like slurred speech,
19   bloodshot eyes, slurring words, thing of that nature.
20       Q.    You never spoke to him until after you had
21   broken the orbit in his eye and knocked his two front
22   teeth out, correct?
23            MR. SWITKES:  Objection to form.
24            THE WITNESS:  Correct.
25
```

```
 1    BY MR. OSTROW:

 2        Q.    Okay.  And do you know whether or not when

 3    you knock someone's front teeth out it affects their

 4    voice pattern?

 5            MR. SWITKES:  Objection to form.

 6            THE WITNESS:  Sometimes it could affect

 7        their speech I would assume.

 8    BY MR. OSTROW:

 9        Q.    When you break the orbit of their eye and

10    send pieces of bone into their sinus cavity, does that

11    affect their level of consciousness?

12            MR. SWITKES:  Objection to the form of the

13        question.  Obviously argumentative and harassing.

14        You can answer the question.

15            THE WITNESS:  Can you repeat the question?

16    BY MR. OSTROW:

17        Q.    When you punch someone in the face hard

18    enough to break their orbit and send pieces of bone

19    into their sinus, is that enough force to cause a

20    concussion?

21            MR. SWITKES:  Objection to the form of the

22        question.  Argumentative and harassing.

23            THE WITNESS:  I'm not sure.

24    BY MR. OSTROW:

25        Q.    You are a trained EMT, correct?
```

1      A.     Correct.

2      Q.     And it's your testimony that you don't know

3  when you punch someone in the face hard enough to

4  break the orbit in their eye and send bones into their

5  sinus whether it's enough force to cause a concussion?

6           MR. SWITKES:  Objection to the form of the

7      question.  Obviously argumentative and harassing.

8           THE WITNESS:  I don't know how hard it takes

9      to punch somebody to cause a concussion.

10          MR. SWITKES:  Although I will commend you

11     for not raising your voice on that question.

12          MR. OSTROW:  I think I'm almost done.

13  BY MR. OSTROW:

14     Q.     When you viewed the tape of the incident,

15  did you see evidence in that tape of Mr. Gomez

16  resisting arrest?

17     A.     Yes.

18     Q.     What evidence?

19     A.     When Officer Blanco was trying to control

20  his lower body, you can see him kicking his feet,

21  that's when Officer Blanco loses control.  At one

22  point I have his hand all the way behind his back.  It

23  slipped out from him resisting.  The only way it would

24  slip out is from him actually resisting, moving his

25  arms.  And it also shows him getting on his knees and

```
 1   almost standing up after we are giving loud verbal
 2   commands to stop resisting.
 3       Q.    Do you recall your testimony that the
 4   resistance occurred when he was getting up on his
 5   knees?
 6       A.    Yes.
 7             MR. SWITKES:  Tell me what page, counsel.
 8             MR. OSTROW:  Page 42.
 9   BY MR. OSTROW:
10       Q.    Now, are you saying that was an inaccurate
11   answer?
12       A.    No, that was part of the resistance.
13       Q.    That was part of the resistance, not the
14   resistance?
15       A.    No, there were several parts of the
16   resistance.
17       Q.    I see.  Now, after you knocked out his teeth
18   did you look for them?
19       A.    No.
20             MR. SWITKES:  Objection to form.
21   BY MR. OSTROW:
22       Q.    Why not?
23       A.    I didn't know I knocked out his teeth.
24       Q.    When did you figure out that you had knocked
25   out his teeth?
```

Deposition of Andy Lozano                                    Steven Gomez vs. Andy Lozano

```
 1              MR. SWITKES:  Objection to form.
 2              THE WITNESS:  Well, if it was me, that I
 3         knocked out his teeth?  I found out I believe when
 4         we got in the station that he was missing his
 5         teeth.
 6    BY MR. OSTROW:
 7         Q.    When you lifted him off the ground he had
 8    blood all over his face, didn't he?
 9         A.    He had a drip of blood.
10         Q.    Is that how you describe it?
11         A.    Everybody can say it different.  Somebody
12    can say a lot of blood, somebody can say a little bit
13    of blood.
14         Q.    What is it in your opinion?
15         A.    It was not a lot of blood.
16         Q.    It was a drip of blood?  Is that how you
17    characterize it?
18         A.    There's different ways you can say it.
19         Q.    Where was the blood?
20         A.    Coming out of his mouth.
21         Q.    So was bleeding from the mouth and you
22    didn't look at his teeth.  Is that what you are
23    saying?
24         A.    At that time, no.
25         Q.    Have you ever taken steroids?
```

```
 1          A.      No, sir.

 2          Q.      At the time that you had this job, did you

 3   have any other jobs?

 4          A.      At the same time?

 5          Q.      Yes, sir.

 6          A.      No, sir.

 7          Q.      Did you have any night jobs?

 8          A.      No.

 9          Q.      Weekend jobs?

10          A.      No, sir.

11          Q.      So this was your sole source of employment

12   at the time?

13          A.      Yes.

14          Q.      How long of a period of time did you observe

15   Mr. Gomez throwing punches?

16          A.      Could have been a couple seconds.

17          Q.      How many punches did he throw in that couple

18   of seconds?

19          A.      I don't know.

20          Q.      Approximately how many?

21          A.      I can't give you an approximate.  I don't

22   know how many punches he threw.

23          Q.      More than one?

24          A.      Not sure.

25          Q.      Did he throw it with his right hand or left
```

```
 1   hand?

 2        A.    I don't know.

 3        Q.    Do you know whether Mr. Gomez was defending

 4   himself at the time?

 5        A.    No.

 6        Q.    And you never spoke to the lifeguard about

 7   it, correct?

 8        A.    Correct.

 9        Q.    And you never heard the lifeguard say

10   anything about it?

11        A.    No.

12        Q.    Did any of the beachgoers point Mr. Gomez

13   out to you and say that's the guy that was fighting?

14        A.    Yes, something to that effect.

15        Q.    Well --

16        A.    I don't know what words they used to

17   describe, you know.  That's him, he's getting away, or

18   something to that effect.

19        Q.    And who said that to you?

20        A.    One of the beachgoers.

21        Q.    One of the beachgoers?

22        A.    Okay.

23        Q.    And one of the beachgoers said something to

24   you about Mr. Gomez?

25        A.    Yes.
```

```
 1        Q.     Okay.  And you don't remember -- well, tell
 2   me as best you can what you remember that beachgoer
 3   saying to you.
 4              MR. SWITKES:  Objection, repetitious.  You
 5         can answer.
 6              THE WITNESS:  Something to the effect of
 7         that's the guy, he's getting away.  Something like
 8         that.
 9   BY MR. OSTROW:
10        Q.     That's the guy, he's getting away?  Was that
11   in response to a question that you asked?
12        A.     No.  I didn't ask any of the beachgoers
13   anything.
14        Q.     Did any of them tell you that Mr. Gomez had
15   been fighting?
16        A.     Not that I recall.
17              MR. OSTROW:  That's all I have.
18              MR. SWITKES:  We'll read.  Thank you.
19                       - - -
20         (Thereupon, the taking of the deposition was
21         concluded at 12:19 p.m.)
22
23
24
25
```

```
 1                          AFFIDAVIT

 2

 3     STATE OF FLORIDA        )
       COUNTY OF _____)
 4

 5            I, _____, being
       first duly sworn, do hereby acknowledge that I did
 6     read a true and certified copy of my deposition which
       was taken in the case of Steven Gomez v. Andy Lozano
 7     et al, taken on the 25th day of August, 2010, and the
       corrections I desire to make are as indicated on the
 8     attached Errata Sheet.

 9

10

11                       _____
                                   (Deponent)

12     ++++++++++++++++++++++++++++++++++++++++++++++++

13                         CERTIFICATE

14     STATE OF FLORIDA        )
       COUNTY OF _____)
15

16            Before me personally appeared

17     _____,
       to me well known/known to me to be the person
18     described in and who executed the foregoing instrument
       and acknowledged to and before me that he executed the
19     said instrument in the capacity and for the purpose
       therein expressed.
20

21            Witness my hand and official seal, this
       _____ day of _____, _____.
22

23

       _____
24     (Notary Public)
       My Commission Expires:
25
```

```
 1                    CERTIFICATE OF OATH

 2

 3    THE STATE OF FLORIDA)

 4    COUNTY OF MIAMI-DADE)

 5

 6          I, the undersigned authority, certify that
      ANDY LOZANO personally appeared before me and was duly
 7    sworn.

 8
            WITNESS my hand and official seal this
 9    25th day of August, 2010.

10

11

12    _____
      MICHELE ANZIVINO
13    Notary Public - State of Florida
      My Commission Expires: 12/12/2010
14    My Commission No.: DD621770

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                 CERTIFICATE OF REPORTER

 2

 3    STATE OF FLORIDA    )

 4    COUNTY OF MIAMI-DADE)

 5           I, Michele Anzivino, Court Reporter, Notary
      Public, State of Florida at Large, do hereby certify
 6    that I was authorized to and did report said
      deposition in stenotype; and that the foregoing pages,
 7    numbered 1 to 71, inclusive, are a true and correct
      transcription of my shorthand notes of said
 8    deposition.

 9
             I further certify that said deposition was
10    taken at the time and place hereinabove set forth and
      that the taking of said deposition was commenced and
11    completed as hereinabove set out.

12
             I further certify that I am not an attorney
13    or counsel of any of the parties, nor am I a relative
      or employee of any attorney or counsel connected with
14    the action, nor am I financially interested in the
      action.

15

16           The foregoing certification of this
      transcript does not apply to any reproduction of the
17    same by any means unless under the direct control
      and/or direction of the certifying reporter.

18

19           IN WITNESS HEREOF, I have hereunto set my
      hand this 3rd day of September, 2010.

20

21

22    _____
      MICHELE ANZIVINO
23    Notary Public - State of Florida
      My Commission Expires: 12/12/2010
24    My Commission No.: DD621770

25
```

Deposition of Andy Lozano                                    Steven Gomez vs. Andy Lozano

```
 1                    E R R A T A

 2

 3        I wish to make the following changes, for the

 4     following reasons:

 5

 6     PAGE   LINE

 7     _____ _____  CHANGE:_____

 8                    REASON:_____

 9     _____ _____  CHANGE:_____

10                    REASON:_____

11     _____ _____  CHANGE:_____

12                    REASON:_____

13     _____ _____  CHANGE:_____

14                    REASON:_____

15     _____ _____  CHANGE:_____

16                    REASON:_____

17     _____ _____  CHANGE:_____

18                    REASON:_____

19     _____ _____  CHANGE:_____

20                    REASON:_____

21

22     _____    _____

23     WITNESS' SIGNATURE                       DATE

24

25
```